UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Kotulski, Melissa A., *pro se* | ) |
| | ) |
| v. | )     Civil Action No. 3:23-cv-01368-JAM |
| | ) |
| Mirabelle, Anthony | ) |

MEMORANDUM OF LAW RESPONDING TO 10/24/2023 ORDER

### I.    <u>Introduction</u>

Plaintiff, Melissa A. Kotulski, should be granted the *in forma pauris* (IFP) application for this case because she has stated a copyright claim for which relief can be granted. Defendant, Anthony P. Mirabelle, is civilly liable for copyright infringement of Plaintiff, Melissa A. Kotulski's, term "Gigantor" because he actually copied the term of art and said copy is substantially similar and hence makes the Defendant civilly liable. Mirabelle's lack of participation in the argument and negotiations of this lawsuit is indicative of continued abuse of, disrespect for, and taking of Kotulski's business practices, and by extension her intellectual property, namely this copyright. Further, at base, IFP 28 U.S.C. 1915(e)(2)(B) requests are unconstitutional as the standard for vetting IFPs violates due process tenets while it also exemplifies an overreach of the Congressional powers to make all "necessary and proper" laws.

### II.    <u>Legal Standard</u>

Proceeding *in forma pauperis* (IFP) requires the judge to seek 28 U.S.C. 1915(e)(2)(B) justification against dismissal in order to proceed, which provides that an action must "state a

claim on which relief may be granted."[1]  According to Judge Meyer's Court, to state a copyright infringement claim on which relief can be granted and hence survive dismissal in the U.S. District Court of the District of Connecticut, the standard set forth in *Peter Gaito Architecture LLC v. Simone Development Corp.*, 602 F.3d 57, 63 (2d Cir. 2010) should be fulfilled.  The *Gaito Architecture* standard sets out a two-prong test for a Plaintiff to demonstrate: (1) actual copying by the Defendant of the Plaintiff's work; and (2) substantial similarity between the Defendant's work and the protectible elements of a Plaintiff's work.  *Id.*  Taken more generally, failing to state a claim has been viewed by the Courts in conjunction with official immunity for liability. *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971) (Brennan, J.) (immunity reconsidered by lower courts even where failure to state a claim was not).

Also, this case has hencefar denoted vestiges of a taking without just compensation by various Jane and John Does that perhaps should not be listed on the complaint.

Further, when proceeding IFP the 1915(e)(2)(B) standard for dismissal can be used at any stage of the proceeding.  This standard, hence, pits the Plaintiff against both the judge and the Defendant during each stage of the argument, including the beginning, when, typically, under non-IFP complaints, the first set of legal arguments are set forth by the Defendant.  In the case of 1915(e)(2)(B), however, the judge can ask before the summons is even issued for the Plaintiff to justify her argument, while the Defendant likely watches said argumentation unfold.  As such, this provisions calls forth constitutionality arguments like due process as, in this case, depriving a person of their property rights in such a manner that contravenes the Fifth Amendment of the U.S. Constitution.  There is some U.S. Supreme Court jurisprudence on the matter.[2]  Due process

---

[1] The other two standards: (i) frivolity or malice as well as (ii) monetary relief from a defendant who is immune from such relief.  Judge Meyer did not clarify if he wanted review of these two prongs.
[2] *Coppedge v. United States*, 369 U.S. 438 (1962) (Warren, CJ) (criminal appeals case proceeding IFP permitted because petitioner's argument overcame the frivolity standard); *Coppedge v. United States*, 369 U.S. 438 (1962)

"requires, at minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." *Boddie v. Connecticut*, 401 U.S. 371, 377 (1971).[3] In sum, all individuals must be afforded "a meaningful opportunity to be heard if it is to fulfill the promise of…Due Process…" *Boddie* at 379.  Indeed, historically, an indigent party need not be afforded the same "legal arsenal" as the private defendant. *United States v. MacCollom*, 426 U.S. 317 (1976) (Rehnquist, J.) (asserting that a free trial transcript service need not be afforded to an indigent party).  And while the most recent slew of cases address prisoners seeking IFP status, a *pro se* plaintiff is not addressed.[4]  However, services are not the same as a standard set forth in a statute, which should aspire for equal access to all users of the Court system.  Because 28 U.S.C. 1915(e)(2)(B) provides that the IFP must contend against two *de facto* sets of defendants—the judge and the actual other party or parties—the provision is unconstitutional.

Another reason for 28 U.S.C. 1915 (e)(2)(B)'s unconstitutionality is that it goes beyond the metes and bounds of the Congressional power to make "necessary" and "proper" laws.[5]

### III.    Facts & Procedural Posture

---

(Stewart, J.) (truncating review of the case on its merits through a preliminary screening device such as IFP 1915 dismissals raises serious questions of due process because "filing a memoranda in support of an application for leave to appeal is not an appeal" itself.);

This argument has also arisen in Fourteenth Amendment due process cases like *Perez v. Campbell*, 402 U.S. 637 (1971) (White, J.), in which an IFP petitioner's question of the constitutionality of a State law was reversed on separate grounds but utilized some basis on due process claims, or *Boddie v. Connecticut*, 401 U.S. 371 (1971) (Harlan, J.), providing that "due process does prohibit a State from denying, solely because of an inability to pay, access to its courts to individuals who seek judicial dissolution of their marriages."

[3] Like *Bodie*, the present case involves a dissolution of a relationship, arguably marital.

[4] *Lomax v. Ortiz-Marquez*, 590 US __ (2020) (Kagan, J.); *Coleman v. Tollefson*, 575 U.S. 532 (2015) (Breyer, J.).

[5] *Oregon v. Mitchell*, 400 U.S. 112 (1970) (Black, J.) (superseded) (elections may be necessary and proper for Congress to regulate); *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415 (1996) (Ginsburg, J., & Scalia, J. dissenting) (the two discuss the necessary and proper clause concerning the limits of trial judges discretion as a means of ensuring fair administration of justice).  The presidential powers have also been categorized as necessary and proper, see *Dames Moore v. Regan*, 453 U.S. 654 (1981) (Rehnquist, J.) (Presidential power to free hostages, short of an act of war, may be done through all necessary and proper means).

This is about copyrighting a term of art as between Kotulski and Mirabelle.  On November 1, 2022, Kotulski came up with the term "Gigantor" as a result of interactions with Mirabelle.  On November 16, 2022, she reduced that term of art to written form in a text message.  Dkt.1.  During that exchange, he also promised to marry Kotulski.  Sometime between November and January, Kotulski verbally informed Mirabelle that she would be copyrighting the term of art "Gigantor".  And on multitudinous occasions since creating the term of art up through September 30, 2023, Kotulski affirmed to Mirabelle that the term of art "Gigantor" was her property.  Even though a January 30, 2023 stalking and blackmailing incident led to their dissolution of a romantic relationship,[6] which they rekindled in August of 2023, they used the term almost daily between and among each other since that time up through about September 30, 2023.  While on September 30, 2023 Mirabelle said he loved Kotulski, he also made a veiled threat to take over her private business, International Attestations, LLC.  Ex.1.

Without the protection of a father or other masculine figure to temper Mirabelle's male aggressions in the professional-personal world they were developing, and without permitting Kotulski the capacity to negotiate the women in his highly patriarchal sphere of influence, since the August 9, 2023 rekindling, Kotulski was increasingly laid bare to his onslaughts against her person and property due to his promises of marriage and love as well as financial contributions to her business.  They never consummated their love during this rekindling time, however, their last pleasurable intimate exchange on September 28, 2023 was followed by a painful assertion that he would use "Gigantor" with lots of other women despite his promises at monogamy and fidelity.  Because they had begun to blur business relations as well, this indicated that he would use the term of art without remuneration or attribution to her.  And his storied personal history of

---

[6] Kotulski believes this is likely due to her professional involvement with a variety of areas, including counter-terrorism and cyber studies as she has written about in her blogposts. Ex.3.

making promises only to keep them unfulfilled was revealing itself in the business world as well.

For example, Kotulski—as she has done with other guest bloggers—had several sessions

discussing publication of a blogpost on her website, only to probe her for her process and

disclose it to his colleagues and others in his network without ever producing any works to

publish.  This was embodied in an assertion that he made on September 30, 2023 during the

exchanges that came with the veiled threat when he had stated in a phone call that he was talking

to other people about her business and blogging processes.  People he would not name or

disclose to her.

     As a result, on October 2, 2023, Kotulski sought copyright registration of "Gigantor" in order

to protect her interests in the term.  Because of their multiple exchanges throughout the day,

Kotulski asked for a timely response to her filing, giving him up to and beyond close of business

to comment or negotiate before submitting the registration.  Upon submission of the registration,

Kotulski asked Mirabelle to submit a list of any and all use of the term of art "Gigantor" with

anyone other than Plaintiff by October 13, 2023.[7]  She re-submitted this request on October 5,

2023.  He refused to comply by October 13, 2023, even seeking a police report to cease

communications within a week of having said he loved her.[8]  As a result of his lack of

---

[7] This was a typo in the Complaint, presenting itself as October 11th instead of the 13th.

[8] Paula Mirabelle and others were threatening Kotulski through Mirabelle.  So Kotulski stated she would seek a restraining order if those indirect threats continued without direct interactions with those making the statements. She had asked the Mirabelles to obtain an attorney on a separate pending lawsuit concerning breach of contract among other things.  An attorney, Greg Cerritelli, also came to her at the behest of Dominick Mirabelle, the family patriarch, but because Cerritelli represented Mirabelle's parents and not Mirabelle himself—a strong point of contention in Kotulski & Mirabelle's relationship concerning Mirabelle family assets and his lack of individual protection of his own within that system—and because Cerritelli passed himself off as a judge and police officer from the first communication, Kotulski did not feel it appropriate to engage with him.  This attorney was immediately non-conciliatory with what should have simply been **a family matter**.  Further, because Kotulski was given the thumbs up to copyrighting the complaint in a separate matter against Mirabelle's parents, she continued to seek conciliatory mechanisms for negotiation rather than litigious ones as Cerrtielli—a criminal lawyer—focused on.  As such when Dominick gave her the thumbs up on Facebook, she continued her efforts to seek resolution with the Mirabelles.  Cerritelli omitted the thumbs up and filed a police report.  Kotulski filed an identity theft report against Paula with the Federal Trade Commission, and they retaliated even further with another police report the next day on October 8, 2023, when Anthony was to attend church and lunch with Kotulski's mother as a concession

5

conciliatory approaches, she initiated this case of copyright infringement and unlicensed use of

"Gigantor", seeking the following prayer for relief.

## PRAYER FOR RELIEF

1. Seeking a list of all the parties who Anthony P. Mirabelle knows has used the term of art, whether with him or without him, whether female or male.

2. Providing $50 finders fee for each past, present, and future instance on the list, to be distributed upon payment by the other party

3. Seeking $100 payment for each individual use by Mirabelle himself or in conjunction with another in his presence.

4. Should the use be conducted in a film, internet, or other media industry without licensing or agreement, then $10,000 shall be sought from each instance arising from a filmmaking company, internet company or other media company.  If Mirabelle knows of such use and shares it with Kotulski, she will give him $5000 of the licensing fee upon payment by the company.

5. Should unauthorized use of such term be discovered, treble damages shall be sought from the company ($30,000) or the individual ($300).  Should Anthony P. Mirabelle be complicit in such use, treble damages will also be sought from him, whether for use by a company ($300,000) or an individual ($300).

6. Since Mirabelle has refused to make a list, Plaintiff is seeking payment for estimated usage of at least three times a day by him.  i.e. as of October 10, 2023, 344 days after development of the term of art, it would be an $103,200 award.

---

for some arguably criminal harms he had inflicted on Kotulski.  Officer Tory Marsden contacted Kotulski and asked her to cease seeking conciliatory approaches with the Mirabelles, and, except for a certified letter with a litigation hold for Paula and her business Paulmar Associates, Kotulski has directed all communications to Officer Marsden and his superior officer.  Prospect Police indicated that they were accepting service on behalf of the Mirabelles because of Cerritelli's threatening approaches.  They have been non-responsive concerning electronic service and have increased the cost of litigation as such.  The witnesses involved in both cases have been administered a litigation hold, and that list includes family members, business associates like Prospect Jewelers leadership, and others like Judge Tara Knight of the Superior Court of Connecticut.

Even when Mirabelle used the term in private, it has not been fair use.  Due to his large surveillance, public and private, speaking the term of art by Mirabelle is sufficient for doing so with a substantial number of persons outside a normal circle of a family and acquaintances to consider it performative.  And where those conducting such surveillance have utilized the term, they too may be liable in copyright for damages for infringement.  See 17 U.S.C. 501(a) (the term "anyone" includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity…[and they] shall be subject to the provisions of this title in the same manner and to the same extent as any nongovernmental entity.").  Indeed, such a taking is not being litigated in this case per se, however, should a John or Jane Doe come forth, Kotulski hopes that they equitably reimburse her for her intellectual property.  17 U.S.C. 112 & 114; U.S. Const. Amend. V, Cl. 9.  As such, Mirabelle's spoken use also infringes on the copyright and merits an unlicensed use claim.

The original complaint in this case was filed on October 18, 2023, along with an *in forma pauperis* motion as well as a motion to participate in electronic filing and a consent to electronic notice. Dkt. 1-2, 4-5.  The electronic filing was granted, the judge's e-filing standards, order on pretrial deadlines, and the confidentiality order were docketed on October 20, 2023; and Kotulski submitted a notice of compliance of electronic filing order, pretrial deadlines, and confidentiality order on October 24, 2023.  Dkt. 6-9, 14.  In between these, the Clerk made the Federal Rule of Civil Procedure 7.1 Disclosure statement on October 18, Dkt.3, to which Plaintiff

responded seeking clarification on FRCP 7.1 for all parties to further ensure on October 20 with an affidavit, which Plaintiff later withdrew. Dkt.11-12, Dkt.24.  On October 20, 2023, the Clerk requested a 17 U.S.C. 508 compliance form concerning registration of copyright, which Kotulski submitted on October 28, 2023.  Dkt.10 & 23.  After seeking alternate dispute resolution from the Defendant, on October 24, 2023, she submitted a motion to compel alternate dispute resolution, motion for clarification of which 28 U.S.C. 1915(e)(2)(B) prong the Court sought in Docket #13, and extension of time for compliance with order to show cause why complaint should not be dismissed; Judge Meyer denied all of the motions on October 25, 2023 by chastising the complainant for seeking an extension for a blogpost, when in fact she was asking that all future deadlines not be on Tuesdays because it coincides with her blogpost publication and, rather, sought an extension due to medical and professional engagements. Dkt. 13, 15, & 18.  He also chastised her for seeking alternate dispute resolutions through the Court. Dkt.18. Kotulski clarified the motions by seeking reconsideration of the extension for _medical and professional_ reasons, for a FRCP 16(A) Hearing (rather then ADR), and for reasserting her desire for clarification of the 1915(e)(2)(B) prong, all of which was denied without comment by the Court. Dkt.19-21.

Further, because she did not want Mirabelle to be criminally charged for infringement at that time, she sent a cease-and-desist letter which she shared with the Court. Dkt.22. To show her good faith attempt to seek electronic service on the defendant and his proxy at the Prospect Police Department, Kotulski submitted a

notice to the court on October 24, 2023  and, to show her deference to the Judge's authority, Kotulski sent a notice in the form of a letter to Judge Meyer concerning an autofill component of the motion to compel in Docket #15. Dkt. 16-17.  Further, because of an unforeseen delay, she sent notice to the court concerning service of Docket #19 & 20 on the Prospect Police in lieu of Mirabelle. Dkt.22.  And on October 28, 2023, she submitted her report on Copyright Form in order to be compliant with 17 U.S.C. 508. Dkt.23.  The 1915(e)(2)(B) prong clarification has not been provided by the Court as of October 28, 2023.

**IV.    <u>Argument</u>**

   *a.  Defendant has Actually Copied the Term of Art "Gigantor"*

Pursuant to the Fed. R. of Evidence 901(b)(4), the "appearance…of the item, taken together with all the circumstances" indicate authenticity of an item of evidence that a plaintiff is claiming it to be. FRE 901(a).  In this instance, the item is the withheld list of usage of the term "Gigantor" claimed by Kotulski.  That list exists and Mirabelle is withholding that list indicating that Defendant actually copied the term of art "Gigantor".  His copying of the term is implicit in his silence.  As of September 30, 2023, Mirabelle was a frequent caller, phoning Kotulski multiple times a day.  His abrupt silence upon hearing of her copyright registration and her attempts at discovering use is evidence that he has actually copied the term of art in question.

   *b.  Defendant's Use of the Term of Art "Gigantor," and All Its Variants, is Substantially Similar and Hence Makes the Defendant Civilly Liable*

Through the litigation of this case, Mirabelle's actual use of the term will be proven to be substantially similar.  In fact, "Gigantor" can be used as the root for many other words, which includes other variants like *gigantorsaurus*, *giganto*, and other substantially similar terms

derived from it.  Whether Mirabelle was inventive enough to vary the term without engagement with Kotulski may be up for contention, however, his deposed and sworn-testimony should account for such use of the actual term and all its variants. Substantial similarity concerning definition is also at play here.  Indeed, "Gigantor", unbeknownst to this author, had been used in other contexts.[9]  But never as applied to a girthy penis.

The commercial value of using "Gigantor" to describe a girthy penis whether more intimately in private or more openly in public settings can be endless.  For example, it can be used as a promotional feature for marriage—a private institution yielding financial, religious, and social security for those who opt into it.  "The lifelong union of a man and a woman always has promised nobility…without regard to their station in life." *Obergefell v. Hodges*, 576 U.S. 644 (2015) (Kennedy, J.). It is fair to say marriage is an institution for which a girthy penis may be integral for whether or not a contract is formed.  Further, because married people are more successful than single ones, such a formation of a contract may lead to "scoring" several business and professional deals increasing the commercial value of using the term of art "Gigantor" in order to accurately portray a girthy penis.  Indeed, utilizing the term of art that one developed with his former significant other, however, may be a deterrent to such marriage.

While in public settings, one can make millions off of a good term of art.  And sometimes these entities may be doing so within the government pale.  For example, flag-raisings were

---

[9] Gigantor has been copyrighted twenty-nine times.  First issued as a motion picture, with Certificate of Registration RE-0000573684 which was effective on October 2, 1992 having been renewed by PA-0000476955 which was effective on January 10, 1964, the black and white animated series apparently depicts a robot attacking the world at the behest of a master.  The next five were also motion pictures. The motion picture was also associated with the theme song called Gigantor, Certificate of Registration RE-0000649944 which was effective on December 29, 1993 having been renewed by EU-0000883846 which was effective on May 20, 1965.   Other copyrights using the term are either Visual material (5), Recorded document (12), Text (3), or Sound Recording (4).  Perhaps most notably amongst these is "Gigantor Saves the Day," a text document with Registration Number TXu002122533, recorded on October 31, 2018 and "Gigantor Demon Champion Monster Impact" as part of a Horror Sound Design with Registration Number SR-0000954101 recorded on October 5, 2022.

deemed private speech even when outside a city hall.  *Shurtleff. v. City of Boston, Massachusetts,* 142 S. Ct. 1798 (2022) (Breyer, J).  And here, as in *Shurtleff*, there is a possibility that "[t]he boundary between government speech and private expression can blur…"

Whether spoken or written, the use of the term is an infringement of the copyright.  And damages can arise as a result.

c.  *Relief May Be Granted by This Court for the Copyright Infringement by the Defendant of "Gigantor"*

Because Defendant has actually copied the term of art "Gigantor" and because all variants used are substantially similar enough to arise to a cause of action, this court can afford a remedy for infringement.  That remedy is equitable remuneration and enumerated in the Complaint. Dkt.1, see also *supra* Facts & Procedural Posture, para. 3.

d.  *Developing This Argument Without Compelling Defendant to Engage is a Form of Taking*

Taking—whether privately or under the color of law—without equitable remuneration is unlawful.  Any form of intellectual property—copyright, trademark, patents, unfair business practices—has the concept of pay for use for which the world is given notice.  Mirabelle—and all his spectators—were given that notice repeatedly since 2022—Kotulski told them the term of art was hers (though given the right negotiations, she would have considered joint status with Mirabelle).  Mirabelle's continued silence on the matter is tantamount to Mirabelle and/or someone else taking Kotulski's legal approaches without effectively providing anything in return.  Whoever that someone is could be present in this case already or they could merely be spectating to use Kotulski's work without equitable remuneration. Mirabelle and these henceforth unnamed parties are well-aware of Kotulski's expertise in U.S. Supreme Court

jurisprudence, justices, and history.  Forcing her to come to this venue without negotiating is a taking of her work.

Indeed, there are also vestiges of the Non-Practicing Entity (NPE) or the patent troll who does not actually create anything but just buys and sits on patents without using them.  Since meeting in March 2022, Kotulski has always viewed Mirabelle as the most handsome man in the world for her and hopes he is not being trained to become such a troll.

e. *The IFP of 28 U.S.C. §1915I(2) is Unconstitutional because Argumentation Against a Judge is the Deprivation of Property Without Due Process of Law Afforded non-IFP Complainants*

In the process of submitting complaints, non IFP complainants are able to directly proceed to motions practice.  The summons is issued and the defendants begin the process of legal argumentation of the case, typically Fed. R. Civ. Proc. 12(b) motions are at the initial stage for argumentation and that burden falls on the Defendant—not the Plaintiff. IFP complainants, such as the one in the case, however, already suffering from the condition of poverty, must begin the legal argumentation against the judge.  The judge becomes the advocate for the absent defendant, who likely already has a wealth of resources at their disposal.  This statute prompts Kotulski to argue the validity of her claims, while the Defendant licks his chops in the wings without disclosing his processes, is doubly contrary to the due process requirements and is tantamount to starving a dog before sicking him on an unwitting passerby. Further, worse still, the 28 U.S.C. 1915I(2)(B) IFP provision provides this gauntlet at any stage of the case.  Such inequitable due process should be found unconstitutional by the Court, and, hence, inapplicable in this case.

The IFP provision is also an unconstitutional reach by Congress, going beyond the limits of its enumerated powers.  At best, this statute falls under the necessary and proper provision of the

Constitution.  U.S. Const. art. II, §8, cl. 18.  And even then, it is an unconstitutional reach of that provision.  As such, this law is better situated during the regulatory processes that arise when actually promulgating the Federal Rules of Civil Procedure and/or the Local Court Rules.[10]

## V.      <u>Conclusion</u>

As such, the Court should grant the *in forma pauperis* complaint for Kotulski because Mirabelle's actions rise to the level of actually copying "Gigantor" (and all its variants) in a manner that is substantially similar enough to merit litigation.  Mirabelle's continued observation of this lawsuit without engagement is further evidence of his taking Kotulski's work, in general, and her copyright of "Gigantor", in particular, without equitable remuneration by Mirabelle and other(s) against whom Kotulski has yet to file claims.  Finally, and most importantly, 28 U.S.C. 1915(e)(2)(B) is unconstitutional and should not be posited in this or any case in the federal court system.

                                                      Respectfully submitted,

Dated: October 30, 2023               By:   PLAINTIFF,
                                                      MELISSA A. KOTULSKI

                                                      By____/s/ Melissa A. Kotulski____

                                                      99 Robbins Drive

                                                      Wethersfield, Connecticut 06109

---

[10] Such "constitutionality" is modeled in the international legal regime provided by the International Court of Justice, whereby the provisions in the Charter of the United Nations are rather sparse while the Court Statute, Court Rules and Practice Directions give more express guidance to the Court.  Notably, Member States in need are provided assistance through the Trust Fund to Assist States in the Settlement of Disputes through the International Court of Justice. In that Court the Member States are not grilled about the merits of their case in order to receive funding.  They merely make it needs based.  In fact, the Secretary-General's Panel of Experts supply assistance for preparation of memorials, counter-memorials, and replies—rather than forcing the parties to write such in order to even obtain a summons.  A/59/372.  Issues abound with this system as well as the ICJ and other entities in the UN system do not provide a gateway for notice and comment to arise by the public, such as is provided by the United States regulatory rulemaking regime.

Tel: (860) 721-8833

## FRCP 7.1 CERTIFICATION

I hereby Certify that I am a U.S. Citizen of the State of Connecticut, and a

naturalized citizen of Italy through matrilineal heritage but never having lived in

Italy.

Dated: October 30, 2023                    /s/ Melissa A. Kotulski
                                           MELISSA A. KOTULSKI

## LOCAL RULE 7.1 CERTIFICATION

I hereby certify that I attempted to confer with Defendant through Prospect

Police Department, who was unresponsive.  Perhaps the brevity of notice was

insufficient for their response.  Plaintiff asked if email service was sufficient to this

time, and Officer Marsden—the Prospect Representative for the Mirabelles and the

Town—has continued to say nothing.  Hence, indicating a desire of Prospect,

Connecticut leadership as well as the Mirabelles and their legal representatives to

increase court costs.  Mirabelle is always welcome to reach out to Kotulski.


Dated: October 30, 2023                    /s/ Melissa A. Kotulski
                                           MELISSA A. KOTULSKI


## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document will be served by **certified mail** to:

Anthony P. Mirabelle
c/o Officer Tory Marsden
Prospect Police Department
8 Center Street
Prospect, Connecticut 06712

Dated: October 30, 2023                    /s/ Melissa A. Kotulski
                                           MELISSA A. KOTULSKI

14

**EXHIBIT 1.  TEXT MESSAGES ON SEPTEMBER 30, 2023**





## EXHIBIT 2.  LITIGATION HOLD

Melissa A. Kotulski hereby notifies the above-captioned individual and/or company to preserve all electronically stored information, copies and backup, as defined by Rule 34 of the Federal Rules of Civil Procedure, along with any paper files which the above-captioned individual maintain, relevant to this dispute.

Ms. Kotulski will be seeking in discovery electronic data in the above-captioned individual and/or company custody and control that is relevant to this action, including without limitation emails and other information contained on the above-captioned individual computer systems and any electronic storage systems.

Ms. Kotulski considers these electronic data and paper files to be valuable and irreplaceable sources of discoverable information in this matter.

Ms. Kotulski places the above-captioned individual and/or company on notice to preserve all documents regarding Ms. Kotulski and/or any of the agreements previously in effect between Ms. Kotulski and the above-captioned individual and/or company ("Agreements").

In addition, Kotulski places the above-captioned individual and/or company on notice not to allow the deletion of any electronic communications, such as emails, relating to Ms. Kotulski or the Agreements.

She is confident that the above-captioned individual and/or company already have taken steps to preserve this data since they had an obligation to preserve relevant evidence. Thus, no procedures should have been implemented to alter any active, deleted or fragmented data.

Moreover, no electronic data should have been disposed of or destroyed.

I further trust that the above-captioned individual and/or company will continue to preserve such electronic data and paper files throughout this litigation.

Sincerely,

Melissa A. Kotulski
President, International Attestations, LLC
Phone: (860) 721-8833

**EXHIBIT 3.  EXAMPLE OF KOTULSKI'S BLOGPOSTS**

**U.S. SUPREME COURT: WITHER THE CYBER?**

July 25, 2023|Supreme Court--U.S.

My annual authentication outline has included both cyber and advisory at one time throughout my consideration of these specified terms.  As such, during the 2020 Term, I considered both terms at varying degrees of immersion.  My history with these two terms differs.  First, I developed an interest in Cyber Law in 2012, after attending a closed seminar at Georgetown University's Borne Scholars program (my significant other at the time was participating in that program).  Also, advisory opinions at the U.S. Supreme Court became important to me as I developed an interest in the International Court of Justice.  Ahead of my review of the 2022 term, over the next two weeks I will publish my brief analyses from two years ago.

Beginning with "cyber", there has been only one update since 2020 as the term has become antiquated in legal parlance (though it never really had a strong presence, to begin with).  Interestingly, in a First Amendment case during the most recent term, "cyber" did in fact arise in passing. *Counterman v. Colorado*, 600 U.S. __ (2023).  In a case where a female performer who was protected with a case against an overly-zealous fan, the accused was tried and found guilty for sending scores of messages that supposedly a reasonable person would have found threatening.  This all went forward against his argument that he had a First Amendment defense to free speech.  The appellate court agreed with the jury, and the U.S. Supreme Court vacated the judgment because the courts below had not applied the appropriate standard for determining *mens rea* in threatening speech (there seems to be an eradication of that requirement based on recklessness and reasonableness standards that appear to blur the lines between criminal and tort law).  In any event, the phrase used in the opinion by Justice Kagan was a citation to one of those Facebook messages written by other fans defending the singer against her over-zealous fan's advances:  "Staying in cyber life is going to kill you."

Perhaps evocative of Jodie Foster's overzealous fan turned violent, all parties have been overly cautious.  The Court's standard just seems to kick the can down the road for this particular defendant (the Petitioner in this case).  He has to undergo an entire new trial, and the result will likely be the same.  4.5 years in prison for liking a public figure too much, when perhaps interventions should have redirected his gaze before they became criminalized.  Perhaps Counterman has learned his lesson and he might respectfully shift his music appreciation to that of Miranda Lambert, who responded to the recent selfie-gate debate by advising her audience-members to adhere to the rules of the venue and "Shoot tequila shots instead of selfies."

There were no mentions of cyber during the 2021 term.

***
Cyber analysis from the 2020 Term

17

The Court has directly considered cyber matters in a small selection of cases.[1] There are clearly cases that also consider internet, the world wide web, and other similarly situated terms of art.  Due to time constraints, this study focuses solely on "cyber" at the Supreme Court since Chief Justice Roberts has assumed the helm.  The Court has included cyber when discussing small and upstart businesses as well as cyber schools and unwanted electronic contact.  It has also consider cyberspace as the "most important places (in a spatial sense) for the exchange of views."[2]  The Court has also lamented at the expeditious nature of the medium: "While we now may be coming to the realization that the Cyber Age is a revolution of historic proportions, we cannot appreciate yet its full dimensions and vast potential to alter how we think, express ourselves, and define who we want to be.  The forces and dimensions of the Internet are so new, so protean, and so far reaching that courts must be conscious that what they say today might be obsolete tomorrow."[3]  In response, Justice Alito laments that Justice Kennedy's Opinion is not a sufficient account of the differences between the cyber and physical world when considering tenets of free speech,[4] though they later join together when dissenting about the extent of ownership within the context of cell phone usage during the Cyber Age[5]-––posing the difficulty in drawing a constitutional line concerning privacy interests when also considering such cell phone data in comparison to financial and telephonic records.[6]  The Court also analyzed how the Anticybersquatting Consumer Protection Act may protect unregistered trademarks.[7]  In the most recent case, the Court implements the Commerce Clause doctrines as applied to the physical presence rule and later argues against a clear and easy applicability of physical presence in the Cyber Age, with such questions being addressed by state courts.[8]

[1] Bilski v. Kappos, 561 US 593 (Stevens, J, concurring in the judgment) (2010); US v. Jones, 565 US 400 (Alito, J., concurring in the judgment) (2012); Dutkevitch v. PA Cyber Charter School, 565 US 1265 (2012); Packingham v. North Carolina, 137 S. Ct. 1730 (Kennedy, J) (2017); Matal v. Tam, 137 S. Ct. 1744 (Alito, J) (2017); Carpenter v. US, 138 S.Ct. 2206 (Roberts, CJ) (Kennedy, J, dissenting)(2018); South Dakota v. Wayfair, Inc., 138 S.Ct. 2080 (Kennedy, J) (2018).
[2] Packingham v. North Carolina, 137 S.Ct. 1730, 1735. (Kennedy, J) (2017).
[3] Packingham v. North Carolina, 137 S.Ct. 1730, 1736 (Kennedy, J) (2017).
[4] Packingham v. North Carolina, 137 S.Ct. 1730, 1743-1744 (Alito, J, concurring in the judgment) (2017).
[5] Carpenter v. US, 138 S. Ct. 2206 (Kennedy, J, dissenting) (2018).
[6] Carpenter v. US, 138 S. Ct. 2206 (Kennedy, J, dissenting) (2018).
[7] Matal v. Tam, 137 S. Ct. 1744, 1752-1753 (Alito, J) (2017).
[8] South Dakota v. Wayfair, Inc., 138 S. Ct. 2080, 2097-2098 (Kennedy, J) (2018).

**Tuesday, July 25, 2023, 9:00 a.m.**

**Copyright (c) – Melissa A. Kotulski**

# UNITED NATIONS & GLOBAL COUNTER-TERRORISM STRATEGY

June 13, 2023|Comparative systems, Notice and Comment, Terrorism, United Nations

On the crisp Tuesday after Memorial Day, I ventured into New York City to attend events at the United Nations.  Once at the campus, I received a grounds pass from the appropriate office—one that expires on December 31, 2023.  I attended two events:  the Global Counter-Terrorism Strategy revision session (Strategy session) and the opening activities for the 35th Meeting of the Chairpersons of Human Rights Treaty Bodies (Chairpersons Meeting).  Last week I discussed the Chairpersons Meeting, and today I will discuss my observations of the Strategy session.

When visiting the United Nations, I stayed for an hour of the Strategy session.  The Global Counter-Terrorism Strategy was adopted through consensus in 2006 and is embodied in A/Res/60/288, establishing national, regional, and international efforts to fight terrorism.  Every two years, the United Nations meets to discuss revisions for this strategy— basically an international group editing session moderating by a chairperson.  Attending to the second revision of the eighth such session's document when I was in attendance, the Strategy session entailed going through part by part of the strategy and proposing revisions through national representatives.  So, for example, the United States sought a rationale for adding paragraph 9-bis (soon to be released with or without the revision).   During that meeting, I noted that a great deal of participation came from the United Kingdom (UK), United States of America (USA), the Russian Federation (Russia), the European Union (EU), and States from the Organization of Islamic Cooperation(OIC).

Before getting into specific paragraphs, several governments voiced their overall concerns with the strategy's second revision.  Saudi Arabia's representative spoke on behalf of the OIC, with the following slogan: the collective voice of the Muslim world.  They were concerned about combating homophobia, criteria for selecting specific inputs, and whether equal weight to groups and delegations.  The USA followed when its delegate expressed issues with PP20 (desecration of religious texts) and OP86 (rule of law, human rights and gender development; naming the Human Rights and Gender Section of the UN Office of Counter-Terrorism).  Next up was the EU's delegate, who was averse to the deletion of consensus language as well as civil society protections implementation and to the new topical language that do not appear in the Secretary General reports, previous strategy versions, and more.  He, too, was concerned with deletions to OP86.  The UK's representative spoke after the EU, echoing concerns about the deletion of consensus language—urging its retention.  The Russian delegate spoke last during the open comment period on revision 2.  He felt that there was lack of clarity for the selective approaches to the revision, particularly as to why some proposals were taken and others omitted.  He felt there were still many controversial paragraphs in the proposal, and he expressed a concern about paragraphs that were removed.  He affirmed that he was open to further discussion and ready to work constructively with all delegations.

After the general comments, the moderator took them through a paragraph-by-paragraph review of the document.  Frankly, I had a great deal of fun observing this revision session, and had I not other obligations with the human rights world, I would have stayed the entire day!  However, I was only able to stay through their review of PP24.  During that time, while many paragraphs were skipped extensive commentary was provided for eight (8) of those paragraphs (PP 5 bis, 9 bis, 10, 16, 18, 21, 22, and 24).  I have provided a copy of the zero-draft paragraphs in the appendix.

Russia, Saudi Arabia, Egypt, the EU, and Nigeria debated the language of PP 5 bis.  Russia called for naming of specific terrorist organizations and there was a discussion between Nigeria, Egypt, and the EU concerning language concerning regional issues pertaining to Africa.

While the U.S. was the only nation to comment about the addition of 9 bis, they were joined by Russia and Mexico in debating the contents of PP10—focused on underlying conditions of nations that could foster terrorism.  Russia wished for more consideration of violent extremism and racial processes, while the U.S. wished to hear more rationale for opening up to more edits of this paragraph after they had already reached a careful consensus.  Mexico was flexible but wished to see the previously agreed language, while also suggested putting "preventing and" before "countering" in that paragraph.

Saudi Arabia, Nicaragua, the EU, the USA, Australia, Morocco, Switzerland, the UK, Turkmenistan, and Uzbekistan were the ten (10) entities that commented on PP16 (delivery of integrated and coordinated assistance at the field level).  Field presences and resident coordinators were the common topics of debate among these ten governments.  Saudi Arabia and Nicaragua both countered inclusion of resident coordinators.  As for field presences recommendation by Turkmenistan, the US, Switzerland, the EU, and the UK questioned inclusion of such a topic in that paragraph.

After Costa Rica and Mexico expressed their disappointment at the deletion of PP18bis, Russia and US spared over PP21 (importance of the role of the media, civil society, religious actors, the business community and educational institutions).  Russia was concerned with omission of digital technologies used by terrorist and hate groups.

Saudi Arabia, Switzerland, Israel, Syria, and Iraq debated the use of "incitement" of children to terrorism as an important addition to PP22 (systematic recruitment and use of children to perpetrate terrorist attacks).  The OIC, to include Saudi Arabia and Syria and Iraq, as well as Switzerland pushed back against inclusion of the term, with Switzerland's delegate requesting that they narrow the margin of the term.  Israel's representative justified her nation's suggestion to include the word because of the increased instances of this activity.

Finally, Saudi Arabia, Russia, and the EU asserted their viewpoints about including "in particular women-led civil society organizations" as part of PP24 (criminal justice systems standards).  The OIC, through Saudi Arabia, and Russia did not wish to include this phrase, with the latter's delegate expressing concern about particularizing the civil society organizations as "women-led" and wishing for a more whole of government and whole of society approach.  The EU's representative asserted his supranational government's support for the phrase.  Nine nations simple voiced their support of the EU's assertions (US, Switzerland, Japan, UK, Costa Rica, Norway, Mexico, Australia, and Colombia).


## Appendix 1. Highlighted Paragraphs from the Zero Draft

PP10 *Reaffirming* the primary responsibility of Member States and their respective national institutions in countering terrorism, concerned that terrorists continue to endeavour to exploit underlying conditions in some countries, such as limited reach of Governments and lack of capacity to deliver essential services by law enforcement and security institutions, and emphasizing that enhancing the capabilities and capacities of State institutions, where applicable and upon request, to prevent and counter terrorism is a pivotal component for successful efforts against terrorism,


PP16 *Recognizing* the important role of the United Nations in providing integrated and coordinated assistance at the field level, and noting in this regard the efforts of the Office of Counter-Terrorism in increasing its field presence, including at the regional level through programme offices in Hungary, Kenya, Morocco, Qatar and Spain, and the Behavioural Insights to Counter-Terrorism Hub and the Parliamentary Engagement Hub in Doha to facilitate the delivery of programmes closer to beneficiaries, enhance their impact and cost-effectiveness, and strengthen cooperation with national and local counter-terrorism actors, as well as regional bodies and other providers and recipients of assistance, and reminding the Office of Counter-Terrorism field presence to work in close coordination with the wider United Nations presence at the national or regional level,


PP21 *Stressing* the importance of the role of the media, civil society, religious actors, the business community and educational institutions in those efforts to enhance dialogue and broaden understanding, in promoting pluralism, tolerance and coexistence, and in fostering an environment which is not conducive to incitement of terrorism, as well as in countering terrorist narratives,


PP22 *Strongly condemning* the systematic recruitment and use of children to perpetrate terrorist attacks, as well as the violations and abuses committed by terrorist groups against children in all circumstances, including killing and maiming, abduction and rape and other forms of sexual violence, noting that such violations and abuses may amount to war crimes or crimes against humanity, and urging Member States to comply with applicable obligations under the Convention on the Rights of the Child,3 emphasizing the importance of accountability for such abuses and violations,

PP24 *Recognizing* the important contribution to the counter-terrorism efforts of Member States and Global Counter-Terrorism Coordination Compact entities derived from dialogue with and, as appropriate, support for and partnership with civil society actors committed to the principles and objectives of the Charter of the United Nations, as part of a whole-of-society approach, similarly recognizing that civil society actors should be further enabled to contribute to the goals of the Strategy, and in this regard noting the Secretary-General's guidance to the United Nations system,4

4 United Nations Guidance Note on the Protection and Promotion of Civic Space.

**Tuesday, June 13, 2023, 9:00 a.m.**

**Copyright (c) – 2023 Melissa A. Kotulski**