UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| Kotulski, Melissa A., *pro se* | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:23-cv-01368-JAM |
| | ) | |
| Mirabelle, Anthony | ) | |

MOTION FOR THE COURT

Now come the Plaintiff, Melissa A. Kotulski, to respectfully request that Judge Meyer modify docket number 27 issued on October 31, 2023 to more accurately reflect the relationship status of Kotulski to Anthony P. Mirabelle.

Kotulski and Mirabelle were in negotiations for marriage up until September 30, 2023. Their relationship began with him courting her intensively in March 2022, around the time she established her business, International Attestations, LLC.  While his intentions may have been to hostilely take over her business through that courtship, he promised marriage almost from day one.  His good efforts paid off and she agreed to be his girlfriend with intention to marry and have children before they were intimate.  Throughout that time, he often called her "sweetheart."  Indeed, the subject of the copyright is a bit saucy—something Kotulski in all her forty-five years has abstained from doing in her professional life—however, it did not mean she was promiscuous.  Just someone who wished to have a relationship and a family like everyone else.

1

A Christian woman who chose to undergo an adult baptism in November 2022 in the presence of Mirabelle, a Catholic, Kotulski was both horrified and mortified by the Judge's use of the term "lover" as applied to her serious-minded relationship with Mirabelle.

WHEREFORE Kotulski respectfully requests that the learned judge selects a term more accurately describing the relationship that arose between Mirabelle and herself in docket #27.

Respectfully submitted,

Dated: March 25, 2024          By:    /s/ Melissa A. Kotulski
                                      MELISSA A. KOTULSKI

LOCAL RULE 7.1 CERTIFICATION

I hereby certify that I attempted to confer with Defendant through Prospect Police Department, neither was responsive.  The same outreach has held true for the complaint in this case since outreach on the matter began on October 2, 2023.

Dated: March 26, 2024                  /s/ Melissa A. Kotulski
                                       MELISSA A. KOTULSKI

CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document will be served by mail to:

Anthony P. Mirabelle
c/o Officer Tory Marsden
Prospect Police Department
8 Center Street
Prospect, Connecticut 06712

Dated: March 25, 2024                   /s/ Melissa A. Kotulski
                                        MELISSA A. KOTULSKI

## EXHIBIT 1.  BLOGPOST CONCERNING BARBARISM AT THE COURT TO HIGHLIGHT KOTULSKI'S HURDLES WHEN SEEKING ROMANTIC RELATIONSHIPS

## HATS OFF: BARBARISM & THE COURT

December 5, 2023|Capital punishment, Constitutions, Judges, Presidential Papers, Separation of Powers, Supreme Court--U.S.

Guttural female screams in Italian punctuated the scene, as the pack scurried up the stairs to punish the beautiful woman who to them represented all the sins of Italy during World War II.  That Sicilian wartime "bride" had committed the mortal sin of succumbing to their men's advances by taking on paying lovers because of necessity.  Embracing her role as the town trollop, she had dyed her hair, smoked cigarettes, and feasted jovially with those giving her the attention—and money—she needed for survival.

Her mane had become the target of the female aggression that had runneth over when they attacked her so violently by pulling her out of her lover's chambers by her hair into the public square—a very symbolic place in Italian culture and history as well as the nation's court of public opinion—stripping her of her clothing, beating her beauty out of her, and cutting her locks to the quick.  Maléna got up after the women's physical aggression had climaxed with the shearing of her hair.  Her scream at the quiet bystanders met a stoic wall of mostly masculine bodies.  All watched as she limped away after their release had culminated in the brutal decimation of a lovely body and face and...head of hair.

The young boy serving as the protagonist in the movie, *Maléna*, could only watch as the women finished their physical assault.  Throughout this coming of age movie, he wanted what every Italian teenage boy did at that time--a sizable penis and long pants.  He also witnessed Maléna's devolution to what the villagers called "whore" status.  Part of that devolution included being called an adulteress with one woman's husband.  She was put on trial for this act against the family, for which. she was ultimately acquitted.  At least, at the earlier stage of her devolution, she was given her day in a judicial court.  But at the time of the trial, her father was alive.  The public square barbarism occurred after he died, taking his patriarchal protections (and money) with him.

Frankly, dear readers, I feel like I have been the subject of such a barbaric attack recently--but not in the square, the Court!  So, you know me, I decided to channel that energy into learning more about the scourge of barbarism in my various courts of interest--U.S. Congress, the U.S. Presidency, and the U.S. Supreme Court.

3

**Barbarism in U.S. Congress**

Barbarism in the public square is as symbolic as that which arises in the modern Courts--which have origins during the time when royalty reigned supreme over monarchical systems.  International Court of Justice (ICJ) judgments have never actually mentioned the term "barbaric."  However, the United States Congress has used it to condemn Cuba's one-time leader, Fidel Castro's, "blatant and barbaric violation of international law" that was tantamount to cold-blooded murder when he used lethal force that was inappropriate when he ordered that The Brothers to the Rescue planes used for searching and aiding Cuban refugees be shot down.  This section of the code concluded by extending Congress' condemnation for the act and condolences to the families while also urging the President at the time (Clinton) to seek indictment for the act before the ICJ.  Instead of the United States Government directing those energies on such a condemnation of an attack of its people in the mid-1990s, the Mexican government preempted the U.S. filing something against Cuba with it's own case against the United States a decade later when it asserted barbarism with regard to the death penalty cases of several of its nations in the *Avena* case at that Court.  Perhaps, like my attempts at filing in the 2nd Circuit that made me look "defective", the United States was prevented from filing against the Cubans before such a matter arose in the World Court.

**Barbarism in the U.S. Presidency**

There's basically nothing about Parliament in *Maléna*, but there's talk of the leader of the executive department of Italy in the 1940s.  Which brings me to barbarism in the the U.S. Presidency. In Executive Order 13773 by President Trump, he strongly condemned the barbarism of transnational organized crime by calling the violence and abuse by transnational criminal organizations including drug cartels "barbaric acts" that included brutal murders and rapes.  President Biden's administration wrote Executive Order 14060 and listed a longer set of criminal activities as drug and weapons trafficking, migrant smuggling, human trafficking, cybercrime, intellectual property theft, money laundering, wildlife and timber trafficking, illegal fishing, and illegal mining.  Although it amends Trumps EO, it is interesting to note that neither murder nor rape is expressly listed in Biden's EO.  Use of medical systems or what I have come to call forced dolemanship (i.e. making people utilize social services to impoverish them and criminalize them for financial, status-based, and other gains) is not mentioned in either EO.  That body of evidence remains unstated in these particular EOs.

Maléna today perhaps could be killed without express recourse by transnational organizations.  Maléna perhaps could also be raped by the same.  What are a few casualties in the war between the police powers and the criminal sects that counter those powers?  How interesting that Trump's administration did not let such assaults on individuals stand when discussing transnational organizations.  This inclusion is perhaps more illuminating because I

4

remember well, President Obama and Vice President Biden's campaign against date rape in colleges as I was attending University of Iowa in the early 2010s.  They encouraged young men to say something if they saw something and not to become bystanders to such activity.

Perhaps this was, in part, in response to an incident that happened to a fair journalist in the Middle East.  During the Arab Spring more than ten years ago, when she was being attacked by the men in the public square in Egypt, across the Mediterranean from Italy, a group of women surrounded her to prevent their continued aggressions against her.  She symbolized female autonomy, she symbolized female sexuality, and she symbolized the field's inquisitiveness.  She was their target, but this group of women did not tolerate her being attacked by the irate men as it was counter to their Muslim values.  These events were among those that led to the development of a new constitution for Egypt.

Both the fictional Malèna and the journalist covering the Arab Spring walked away from these mob attacks, and both were able to build again despite the attempt at a group of people attacking them for the trappings of their gender.

**Barbarism in the U.S. Supreme Court**

Although ICJ judgments do not expressly include barbarism and it only arises scantly in Congressional Statutes and in Executive Orders, the U.S. Supreme Court opinions are rife with the term.

In those opinions, barbarism is synonymous with—albeit distinguishable from—inhumane, unchristian, cruel, and illegal activity.  Antibarbarism is also a consideration, for example Justice Scalia deemed anti-abortion laws as anti-barbarian.  The Court has used other nations to distinguish the U.S. approaches to barbarism analyses.  Namely, Spain, France, and Germany were chastised by Justices Stewart and Scalia for using torture as well as mechanisms for extorting confessions of a crime; while Sharia law was chastised by the Court for being used to treat those of other faiths inequitably.  And while there is basically a NIMBY attitude about cruelty as applied by my home nation's government, in that we are NOT like those other nations that have harsher punishments, some Justices have considered this concept when determining the level of excessiveness in statutes.

Death Penalty & Barbarism at the U.S. Supreme Court

Barbarism at the Court has typically been associated with how punishments, primarily the death penalty, are implemented.  Typically considered in the context of the Eighth Amendment, the Court has always fallen short of eradicating that particular punishment in the United States and it

has focused mostly on the method of death penalty administration, the reasons for such administration, and the people on either side of the execution

Methods considered by the U.S. Court have included hangings, electrocution, the wheel, flaying alive, rendering asunder with horses, maiming, mutilating, scourging, cyanide gas, lethal injection, and more. In fact, at one time the whipping post was thought to be the more humane as compared to quartering, hanging in chains, etc. Obviously, the spectrum of acceptable punishments has shifted throughout history.

The reasoning for barbarism is, at base, determined by cruelty jurisprudence. "Cruel" definitions listed in Court opinions also include pleased with hurting others; hard-hearted; void of pity; wanting compassion; savage; unrelenting; disposed to giving pain to others, in body or mind; willing or pleased to torment, vex or afflict; destitute of pity, compassion or kindness. This jurisprudence has grown from the advocacy of Patrick Henry in Virginia and Holmes in Massachusetts, the leaders among those who advocated in the 11 other constitutional conventions of the Founders (though the others have never expressly been articulated at the U.S. Supreme Court).

The two-part test for a punishment's barbaric excessiveness became (1) having no measurable contribution to goals of punishment and nothing more than purposeless or needless imposition of pain and suffering; and (2) being grossly out of proportion to the severity of the crime. *Coker v. Georgia*, 433 U.S. 584 (1977) (White, J.). Focusing on the second prong, when considering acts such as those that arose in the movie *Maléna* and in the Egyptian square, proportionality was considered in more depth in *Rummel*. *Rummel v. Estelle*, 445 U.S. 263 (1980) (Rehquist, J.), citing to *Weems v. United States*, 217 U.S. 349 (1910) (McKenna, J), where the Court also brings about an analysis of what constitutes barbaric punishments that are grossly disproportionate. *Rummel v. Estelle*, 445 U.S. 263 (1980) (Rehniquist, J.). The severity of such is determined, in part, by State application of punishments, and that the punishments implemented by State law must be respected. *Rummel v. Estelle*, 445 U.S. 263 (1980) (Rehnquist, J.). But Sotomayor bucked against this in latter dissents. Still, Justice Powell disagreed with some of the proportionality analysis because he considered life imprisonment for a non-capital offense to be disproportionate. *Rummel v. Estelle*, 445 U.S. 263 (1980) (Powell, J.). Powell even brought up how proportionality was considered in Statutes. It was the *Rummel* opinions that led to the affirmative statement distinguishing gross disproportionate punishments from barbarous ones, indicating that the spectrum of punishments make barbarism the floor for determining cruel and unusualness. *Rummel v. Estelle*, 445 U.S. 263 (1980) (Powell, J.).

Many issues arise when considering barbarism and the death penalty. How the death penalty has been administered differently between states has been problematic, For example, South Carolina did not fair as well as New York in the eyes of Justice McReynolds. Further, punishment for rape must be proportionate, and almost never includes the death penalty.

Many justices have taken a crack at the barbarism bat:  Justice Frankfurter considered the term in the context of due processes as well as insanity and the death penalty; Justice Black talked about the excessiveness of prosecution of thought crimes; Justice McKenna affirmatively stated that death in itself is not a cruel punishment; Justice Burton winced at the barbarism involved with continued beating of a dead horse; and Justice Vandevanter highlighted that some governors in Spanish colonies were more civilized than others   Further, barbarism was extensively considered by longest serving Justice in history, Justice Douglas, in the mid-20th Century when he lamented barbarism at the U.S. Supreme Court, especially concerning the death penalty as well as peoples who sacrificed others.  The latter led to justification for converting to Christianity, and the former indicates an instance when he was the sole Justice to utilize the term barbarism during the late Warren and early Burger Court eras.  Perhaps he was the only Justice at that time who *could* use the term...  His separate opinions on barbarism were centered on jury standards for determining a first-degree murderer's punishment and on the Sixth Amendment as applicable to the States.  Justices Brennan took up the barbarism helm on the eve of Justice Douglas' departure—it would make sense given their careers at the Court.  Later, Justice Marshall actually discussed the differences of approaches in implementation of the federal constitution by State through Henry & Holmes   Marshall wrote about the moratorium on the death penalty in the 1970s, "In recognizing the humanity of our fellow beings, we pay ourselves the highest tribute.  We achieve 'a major milestone in the long road up from barbarism' and join the approximately 70 other jurisdictions in the world which celebrate their regard for civilization and humanity by shunning capital punishment." *Furman v. Georgia*, 408 U.S. 238 (1972) (Marshall, J.) (citing to Clark's *Crime in America*from 1970).

Finally, the Court has debated categories of people who can be executed. Cases concerning the insane, the youth, people who are addicted to drug, and those with medical conditions are among the people who the Court has discussed may or may not be administered the death penalty.  And as for those administering the barbaric acts, it can come from both the State as well as private individuals and organizations.

Barbarism & Other Cases the U.S. Supreme Court

Other reasons for using barbarism have arisen throughout the Court's jurisprudential history include the taking of lands, polygamy, inequitable legal considerations of those of other faiths, description of inventions, reasons for converting people to new religions, and methodologies of execution machines (such as that was used by the Nazis). The term has also been used when describing vengeance or even acts emanating from racial hatred as well as when considering the degree of pain inflicted on the child during abortions. Due process, separation of powers, criminal law in general, and other constitutional concepts arise in the relevant caselaw.

Other punishments have been considered by the Court.  For example, sometimes barbarism in criminal law does not have to go so far as to inflict the death penalty as to be called forth by Justices at the Supreme Court.  Sometimes it's as simple as convicting when there is reasonable doubt of the accused culpability, in which Justice Douglas chastised the plurality opinion concerning the Sixth Amendment as applicable to the States concerning jury trials.  Another example of the term of art arose during the WIlson Administration in an espionage case.  Russian nationals naturalized as Americans were charged for making hyper-critical assertions against President Wilson and incendiary critiques of wartime inventions, the manifesto of these nations included an anti-war statement against the method of dispute settlement utilized by humanity since basically the beginning of time.  Also, involuntary confessions through jailhouse beatings that were elicited by prosecutors have been considered inexcusable, and corporal punishments were not subject to the protections of Eight Amendment.

Prison conditions may constitute cruel and unusual punishment.  Namely, excessive physical force against a prisoner may constitute cruel and unusual punishment even when the inmate does not suffer serious injury.  One justice wrote separately to assert the irelevance of the intentions of civilly liable aggressors, the sheer barbarism of the act is sufficient enough.  Broadcasting trials before punishment have become punishments in themselves prompting a barbaric perversion of decent justice. *Chandler v. Florida*, 449 U.S. 560 (1981) (Burger, CJ) (chastising the Yankee Stadium show trials).  And according to the Court, submitting oneself to a barbarous punishment voluntarily cannot stand because they harm societal values and the Justice System's integrity.

Barbarism has arisen in civil matters as well.  Interestingly, while holding that a prisoner who was not seriously injured could still be considered a victim of cruel and unusual punishment, Justice O'Connor did phrase her analysis of the supposed "unacceptability" of torturous and barbarous punishments by saying that the framers proscribed these punishments as a primary concern for the Constitution.  Justices considering employment law cases have stepped up to the plate as well, with Justice Marshall holding that women's weight and height standards were appropriate where barbaric and inhuman conditions arise.  Damages can arise when barbarism is involved, such as when there is "physical abuse of such base, inhuman and barbaric proportions as to shock the sensibilities." Barbarism, by one justice, has even appeared in the intent of Congress as described by individuals decrying immunity provisions for their bar against personal injury.

 In the context of considering the maxim that "it is better for a thing to have effect than to be made void," the Court's very first discussion of barbarism arises in when considering land rights.  The Court described the feudalistic barbarism that comes with stripping people of their lands when charged with a high crime.  However, such landgrabs have been justified when they have been considered barbarously owned.   Finally, the Court has use the term of art concerning the repossession of personal property in relationship to secured transactions, Justice White caught the Barbaric bug from Douglas when he called the related property law a procedure that was "not some barbaric hangover from bygone days." *Fuentes v. Shevin*, 407 U.S. 67 (1972) (White, J.).

8

My Bouts with Barbarism

So you might be thinking, "What gives, Melissa?  Why do you think you're a victim of barbarism?" Basically, perhaps like many others, I have been feeling like I have been living a life of a death of a thousand cuts.  Or, as I like to say in short, excuse me for living.

For example, a few years ago, I began purchasing baseball hats from law schools that have influenced my consciousness.  The inspiration for this collection stems from an old habit that I developed in graduate school.  Before beginning my writing sessions, I'd rub my special flat rock from a beach long forgotten while wearing a New York Yankee fisherman's hat given out during a promotional day to which my father made sure to get me.  So I started this collection with the purchase of a Georgetown Law hat, where I got a parking ticket when going into the law school to pick it up.  GMU's was quick and easy, though very white!  American, Harvard, and Iowa were obtained without incident—I think.

And my most recent purchase was prompted by an inequitable judge who made the false assertion that I was averse to his alma matter, Yale, because I live closer to Hartford (PS I tried buying a hat several years ago, but for some inexplicable reason...they were not available when I looked).  Without that great university, I would not have learned half the things that I know about history, culture, the law, and other important topics to Americana.  In fact, one of my fondest academic memories was engaging with a leader of the U.S. Department of Homeland Security when attending her lecture about human trafficking in the United States—in 2005 or so.  I have never worn the hats, but recently I decided to reclaim my school habit with my Georgetown Law hat. I chose it because the school has influence my thinking on international law as I considered enforced disappearances, a treaty that has been ratified by nations like the Ukraine and Italy but not the United States and Russia.  The next day, a scalp condition that I had struggled with for a couple of years, resurfaced. It was then that I realized this recent scalp condition came about around the time that I began collecting these caps.  Caps that I never wore, caps that I hoped to share with my spouse, children, and more, to use them as symbols of the stories of the great experiences that I had at these various law schools.

Another example of such barbarism arose when I went through a hunger strike in 2016 in order to stop the assault of female aggressions after I had lost my father and fiancé as well as after I had struggled through some coursework as a returning, older, Caucasian, female student.  Something similar happened in 2017, 2019, and 2021.  I suppose, with the Affordable Care Act in play, if I never marry, it'll happen again and again and again until I'm dead and at least I'll have my hats--I hope!

9

The assault in the public square moved to the Court in 2023.  This assault has been inflicted on my life *ad absurdum* as I attempt to build what everyone else wants—a career, a family, a husband, maybe even a baby—my would-be mother-in-law as well as my mother were both in the public square this time and they both were made angry enough to bring out the proverbial scissors from Maléna.  Joining the two women who should have been encouraged to grow fonder of me was a district court judge, the circuit court clerk's office, various law enforcement entities at the local, state, federal and international levels, the medicalis, a combative attorney, and Anthony.  And the District Court Judge was among the group calling me a "whore" as he held me down while they symbolically cut my hair and beat me (and my dog) down for trying to advocate for a life--with or without Anthony--that included advocacy to remediate a harm and advocate for my property.  At least the Italian Courts provided Maléna her day in court to clear her name—which they did. Neither that judge nor the courts called Maléna a whore.

What are you gonna do?  I'm an unmarried, older woman, without children.  Back in the day, during horror movies, the old adage went that African American men or women were the first to go.  I recently re-watched *Primary Colors*, where Kathy Bates plays an overweight, unmarried, Caucasian, Lesbian who supports various nitty gritty advocacy for the presidential campaign of her candidate that was based on President Clinton's rise to the position.  The African-American protagonist watches as she loses her faith in the candidate because of his decision to besmear what she thought was a good man.  He bore witness to her self-inflicted gunshot wound to the chest, and survived to tell the tale in the end--probably establishing a new archetypal approach to the horror genre.  I suppose my disappointment in the District Court judge is somewhat like Kathy Bates' character in *Primary Colors* (except I'm not a Lesbian and I don't work for him directly)...but I won't be meaning to shoot myself in the chest.  It's not a hat that I'd like to wear because that'd be barbaric.

\*\*\*

I have a pair of shoes that were maliciously sent to me because they do not fit my feet, even though the same pair of shoe did perfectly at the United Nations in October...

I hope you or someone you know might purchase them to support International Attestations and, in part, its contribution to the Federal Pro Se Legal Assistance Program of the New Haven Legal Assistance Association--in honor of my Nonna, Teresa Ciarcia.  Please find them at the link below.

htttps://www.ebay.com/itm/155930561107

\*\*\*

To listen to this article, please check out the following links: https://youtu.be/fPQqze94t78 or https://internationalattestations.com/videos.

PS -- Part of the reason I speak Judge, comes from something I watched during the Obama Presidency. At the Correspondents' Dinner about a decade ago, Obama's speech was translated into ebonics by Keegan-Michael Key to allow the President's message to be delivered diplomatically while the comedian interpreted each phrase intensively in a manner evocative of the shucking and jiving minstrel shows of yore with a 21st century linguistic presentation. The presentation ended with Key responding to Obama's statement: "Instead of doing anything about it, we got elected officials throwing snowballs in the senate. It is crazy." He said: "Woah, hey, all due respect sir, you don't need an anger translator, you need counseling."



One of the hats in my hat collection, with gratitude for the many influences provided by the Elis--good, bad, and indifferent.

**Tuesday, December 5, 2023, 9:00 a.m., updated at 9:03 a.m., updated at 4:35 p.m.; updated at 2:22 a.m. on December 10, 2023; updated December 27, 2023 at 3:35 a.m.**

**Copyright © -- 2023 -- Melissa A. Kotulski**